UNITED STATES of America,
Plaintiff–Appellee,

v.

John A. RAMUNNO, Jr., Defendant–
Appellant.

No. 97–2132.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 20, 1997.

Decided Jan. 7, 1998.

Kit R. Morrissey (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Raymond C. Miller (argued), Miller & Williams, Fort Lauderdale, FL, for Defendant–Appellant.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

John Ramunno wanted to reap the benefits of a plea agreement without suffering the consequences of his bargain. A grand jury indicted Ramunno on cocaine conspiracy and possession charges. In an attempt to obtain a reduced sentence, Ramunno agreed to supply the Government with information about the cocaine conspiracy with which he was involved. He disregarded his contractual obligation to cooperate fully with the United States, however, by repeatedly deceiving government agents and attempting to hide the profits and assets derived from his illegal activities. Not surprisingly, when the Government discovered Ramunno's subterfuge, it took the position that it was no longer bound by the plea agreement.

The district court accepted Ramunno's plea of guilty on the two charges and sentenced him to 262 months incarceration, five years of supervised release, and a $5,000 fine. Ramunno argues on appeal that the district court committed three errors in calculating his sentence. First, the court erroneously applied a two-level enhancement for obstruction of justice. Second, it refused to grant a two-level reduction based on the "safety valve" provision of USSG § 5C1.2(5). Finally, in an argument somewhat derivative of

the first two claims, Ramunno contends that the district court sentenced him without regard to his plea agreement with the Government. We affirm the district court's sentencing determinations.

## I. BACKGROUND

An Illinois state trooper stopped Ramunno on April 5, 1996, for driving his moving van over the speed limit and with an expired registration plate. Ramunno's nervous and self-contradictory answers to the trooper's questions aroused the officer's suspicions. Ramunno consented to a search of his van, and the trooper discovered eight boxes inside. Three of the boxes were empty, but five of them were filled with cocaine which totaled 196 kilograms. Two more kilograms of cocaine were found inside a tool box, and the trooper discovered another two kilograms inside a "shop vac" cleaner.

Upon arrest, the trooper seized several false identifications from the appellant—from New York, California, Nevada, and Florida— all of which identified him as Michael Reinig. Ramunno also carried a certified birth certificate for Michael Reinig. In addition, the officer seized a key to a safe deposit box. The appellant admitted to the trooper that he rented the van under this alias and that he was to be paid $1,000 to drive the van to a truck stop in Pittsburgh. Once he arrived in Pittsburgh, he was instructed to call a phone number (which he refused to provide to the police), to punch a certain code, and then to fly to New York while someone else retrieved the van full of cocaine. Ramunno admitted that he knew something was not "kosher" with the load he was carrying.

A grand jury returned a two-count indictment against the appellant on April 19, 1996, for conspiracy to possess and distribute cocaine (21 U.S.C. § 846) and for possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1)). Although Ramunno retained two other lawyers, one of his cousins—an attorney from Cleveland, Ohio-came to his arraignment on May 1, 1996. Ramunno gave his cousin a letter to mail to Rich Musilli in New York. The cousin did not know the content of the letter and did not get around to mailing it until June 24 from Cleveland.

The letter reveals Ramunno's intent to deceive the Government in the upcoming interviews to be conducted pursuant to his plea agreement. Ramunno directed Musilli to go to a particular house in Pennsylvania at which a large amount of drug proceeds were stowed away. The letter reveals Ramunno's calculated plan to remove money hidden in the Pennsylvania house before it could be seized by the Government. He wrote, "I'm facing up to 25 to 30 years but I can bring it down to 7 year[s] maybe less.... I have a lot of money at the house in PA. I need you to get it before I talk." Later in the letter, Ramunno underscores the importance of this task and his desire to enjoy the benefits of both a plea bargain and the drug money: "If you get these thing[s] I'll be all set. I can work a deal and get out of here." The most damaging statement comes later in the letter when Ramunno reveals his knowledge of the amount of drug proceeds in the Pennsylvania house: "No one know[s] about the $. Everybody is trying to get me. I need this BAD! The money may be 100 to 500 thousand maybe more." The rest of the letter contains detailed instructions on how to reach the house, how to disconnect the house's alarm system, how to find the money within the house, and how to discuss the task in coded language over a monitored prison phone line. A confidential informant turned the letter over to law enforcement officials a little over a week after it was mailed.

Five days after the appellant's cousin mailed this letter to Musilli, Ramunno signed an agreement with the Government to participate in a series of proffer interviews. This agreement essentially detailed the uses to which the Government could put information divulged by Ramunno. He was interviewed that same day by investigating agents for the first of four times. Ramunno told the investigators that he was a friend of William Penna, who was involved in the transportation of thousands of kilograms of cocaine across the United States on behalf of three Colombian families. Penna asked Ramunno to transport cocaine across the country in July and August 1995. Ramunno stated that he had made two prior smuggling trips for Penna—he had transported 400 kilograms of

cocaine in August 1995, and he had moved another 150–200 kilograms two months later. He was arrested on his third job in April 1996, but he was aware of two other couriers transporting 200 kilograms each during the month of April. Ramunno stated that the conspirators stashed the smuggled cocaine in a self-storage facility in Brodheadsville, Pennsylvania, and that he lived in a residence near the storage facility. This residence was the one discussed in his letter to Musilli, but Ramunno failed to mention in the proffer interview that he used the house to hide vast sums of drug proceeds.

The deception worsened in the appellant's second proffer on July 10, 1996. Having read Ramunno's letter to Musilli, the Government's investigators asked Ramunno directly if he possessed any assets from drug trafficking. Ramunno replied that he had none; he stated flatly, "I'm broke." When asked about the safe deposit box key seized from him, he claimed to be keeping the key as a promise to a recently-deceased friend named Bobby Syracuse. He professed ignorance regarding the contents of the box and stated that any contents belonged to Georgiana Syracuse, a relative of the deceased friend.

On the same day as this second proffer, and one week after receiving Ramunno's letter to Musilli, government agents executed a search warrant on the Pennsylvania residence. The agents not only seized records of the cross-country drug operation, but they also found $202,000 in cash and a Rolls Royce automobile. In addition, they found false identifications bearing Ramunno's picture in the name of Robert Syracuse and a key to a safe deposit box that matched the one seized from Ramunno. Agents eventually seized another $48,000 in cash from the safe deposit box which was registered in the name of Robert Syracuse.

Ramunno signed a plea agreement on August 8, 1996 (*see infra* for a detailed discussion of the agreement's terms), but he dug himself deeper into a hole in his third and fourth proffer interviews on September 6 and 19. The investigators informed him that Government agents had searched the Pennsylvania house. Ramunno attempted to backpedal at this point and admitted that the

agents might have found some drug proceeds belonging to him and Penna; he estimated that the amount might have been around $50,000 to $100,000 in cash. The investigators asked Ramunno directly whether he and Penna had hidden away any more cash proceeds from their drug sales, and Ramunno answered that there was no other hidden money. Later, though, when confronted with the Government's seizure of the money from the safe deposit box, Ramunno was forced to admit that the police had seized the key to this box at the time of arrest and that the money contained in the box was drug proceeds that belonged to him. Finally, in the face of direct questioning on the point, Ramunno repeatedly denied that he had corresponded with anyone about retrieving money from the Pennsylvania house. The Government then revealed that they possessed Ramunno's letter to Musilli. At this point, Ramunno had no choice but to admit that he had written the letter and that the money discussed in the letter was drug proceeds.

The Government determined, at this point, that Ramunno's deception and lack of complete cooperation voided all obligations under the plea agreement. The Government explained to the district court soon after the final proffer interview in September that it would take the position at sentencing that Ramunno had violated his plea agreement. Defense counsel, however, repeatedly requested additional time to negotiate with the Government over this position and to talk with his client about Ramunno's remaining options. Counsel made such a request as late as October 15, 1996. Finally, on Friday, November 1, defense counsel and the Government agreed that Ramunno would no longer participate in any proffer interviews. On the following Tuesday, November 5, the Government filed an official notice regarding the position it would take at the appellant's sentencing hearing.

The district court held its first sentencing hearing on November 7, 1996. The Government presented testimony describing Ramunno's violation of his plea agreement and his obstructions of justice. Ramunno requested a continuance of the sentencing hearing, which reconvened on April 25, 1997.

The appellant produced evidence of the assistance he offered to law enforcement officials in prosecuting other drug offenders. The district court found that Ramunno qualified for an obstruction of justice sentence enhancement pursuant to USSG § 3C1.1 and that he violated his plea agreement with the Government, but the court also determined that this was one of the extraordinary cases in which a reduction for acceptance of responsibility was also appropriate. Finally, the court concluded that, in light of his behavior, Ramunno was not eligible for a punishment below the statutory minimum sentence under the special exceptions enumerated in USSG § 5C1.2. The court sentenced Ramunno to 262 months in prison and five years of supervised release, as well as ordered him to pay a $5,000 fine.

## II. DISCUSSION

Ramunno makes three claims on appeal. He contends first that the record did not support his two-level sentence enhancement for obstruction of justice. In addition, he argues that his sentence should have been even lower because the district court should have sentenced him below the prescribed statutory minimum pursuant to the Sentencing Guidelines' "safety valve" provision. Finally, he complains that the district court erroneously sentenced him without regard to his plea agreement with the Government. None of these arguments is persuasive.

### A. *Obstruction of Justice*

■ Under § 3C1.1 of the Sentencing Guidelines, a defendant's base offense level will be augmented by two points for obstruction of justice "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing *of the instant offense*" (emphasis added). The district court stated that Ramunno deserved the two-level enhancement for obstruction of justice for any one of three acts: (1) the letter to Musilli regarding the concealment of drug proceeds, (2) Ramunno's lies to Government investigators regarding his knowledge of the contents of the safe deposit box, and (3) his attempt to deceive

the Probation Department regarding his assets (which would have affected the district court's determination of his ability to pay a fine). The Application Notes to § 3C1.1 explicitly address Ramunno's conduct in this case. Application Note 3 states:

> The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:
>
> . . . .
>
> (d) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceedings . . . or attempting to do so;
>
> . . . .
>
> (g) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;
>
> (h) providing materially false information to a probation officer in respect to a presentence or other investigation for the court. . . .

Ramunno contends that the district court did not make sufficient factual findings to support the imposition of a § 3C1.1 enhancement. Among other things, he argues, the drug proceeds at issue were not related to a count of conviction—or "the instant offense"—as required by the Guideline. Furthermore, Ramunno and his counsel offered testimony that they knew of the Government's seizure of drug proceeds from the Pennsylvania house at the time of Ramunno's statement of assets to the Probation Department; it was for this reason, Ramunno argued to the district court, that he did not include that money in his list of assets.

■ Our review of a district court's imposition of this sentencing enhancement is very limited. A court's determination that a defendant obstructed justice is a factual finding that we will not disturb unless it is clearly erroneous. *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). To meet this standard, an appellant must convince us to a certainty that the district court's factual findings were incor-

rect; merely suggesting the possibility of error is not enough. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This will be an especially daunting task for an appellant if the district court's factual finding is based on assessments of credibility because we give "special deference to the district judge's credibility determinations." *United States v. Pippen,* 115 F.3d 422, 425 (7th Cir.1997) (citing *Hickok,* 77 F.3d at 1007).

All of the bases for the obstruction enhancement in this case relate to the drug proceeds seized from the Pennsylvania house ($202,000 and the Rolls Royce) and the safe deposit box ($48,000). Ramunno persuasively contends that these seized proceeds were not products of the charged offenses. The grand jury returned an indictment against Ramunno on possession and conspiracy violations relating only to the smuggling trip on which he was arrested. These charges did not extend to any other illegal conduct beyond that single episode; the conspiracy described in the indictment's first count lasted only five days—from April 1 to April 5, 1996—and the possession charge relates only to the arrest on April 5. Moreover, the Government signed a plea agreement on August 7, 1996—well after Ramunno revealed his participation in multiple smuggling trips— that states, "Defendant and the Government agree that the total quantity of cocaine constituting this Defendant's relevant conduct was approximately 200 kilograms." If the conspiracy charge extended to Ramunno's other illegal activities, the quantity of cocaine constituting his relevant conduct would presumably have been much higher.

■ For this reason, we agree with Ramunno that the district court clearly erred in finding that he obstructed justice by attempting to recruit Rich Musilli to conceal the products of uncharged offenses. *See United States v. Partee,* 31 F.3d 529 (7th Cir.1994) (invalidating a defendant's obstruction of justice enhancement for conduct unrelated to an offense of which he was convicted). While the district court correctly found that Ramunno willfully lied to investigators regarding the contents of the safe deposit box, there was no sign in the record that those funds were generated by the charged offenses. Indeed, the only evidence in the record concerning Ramunno's anticipated payment for the April 1996 job suggested that he would have been paid a total of $2,000. Thus, the second justification for the § 3C1.1 enhancement is likewise clearly erroneous because Ramunno's lies were unrelated to the investigation of the charged offenses.

■ These conclusions do not mandate reversal, however, because the record supports the district court's third enumerated basis for enhancing Ramunno's base offense level. Law enforcement officials seized the relevant drug proceeds from the Pennsylvania residence and the safe deposit box on July 10, 1996. Ramunno pleaded guilty to the charged offenses on August 8, 1996, and he thereafter participated in a court-ordered interview with a representative of the United States Probation Department. The Probation Department prepares the presentence investigation report from which the district court assesses a defendant's ability to pay a fine and/or make restitution (when relevant). On August 21, 1996, Ramunno signed a certification with Probation Officer John Koechner in which Ramunno certified that the full extent of his assets was $500 in a checking account; the certification further provided that he had no additional assets other than the $3,000 seized upon his arrest. Based on this information, the Probation Department made a recommendation to the district court regarding Ramunno's ability to pay a fine as part of his sentence. This recommendation was obviously flawed because it did not account for the almost $250,000 in cash and the Rolls Royce seized from the Pennsylvania sources.

Ramunno and his counsel testified at the sentencing hearing that this deception was not willful. According to the testimony, counsel informed Ramunno of the Government's seizures before Ramunno made the certification, and, therefore, Ramunno did not consider himself in possession of the funds anymore. The district court did not find this testimony credible and found that Ramunno willfully attempted to deceive the Probation Department. This finding is sup-

ported by Ramunno's contumacious refusals in the September proffer interviews to acknowledge the existence of unreported assets in the Pennsylvania house and the safe deposit box. If he knew in August that the Government had seized the assets, as he claims, then he would not have continued to stonewall the Government's investigators when they questioned him in September. Moreover, the district court's credibility determination finds support in the totality of Ramunno's conduct in this investigation; he consistently lied to the Government in an attempt to avoid the consequences of his criminal conduct. *See United States v. Gabel*, 85 F.3d 1217, 1222 (7th Cir.1996) (concluding that "the totality of Gabel's behavior" supported the district court's conclusion that the defendant willfully misstated information to the Probation Department in the course of the preparation of a presentence investigation report); *see also United States v. Thomas*, 11 F.3d 1392, 1400 (7th Cir. 1993) (affirming obstruction of justice enhancement because the record supported the district court's finding that the defendant willfully provided false information to a probation officer during a presentence investigation). We therefore affirm the district court's finding that Ramunno deserved a two-level sentence enhancement pursuant to USSG § 3C1.1.

### B. *"Safety Valve"*

■ In recognition of the harsh consequences sometimes wrought by the Sentencing Guidelines' uniformity, Congress enacted a provision in 1994 which allows district courts to sentence less-culpable defendants without regard to the mandatory minimum sentences in certain cases. *See USSG § 5C1.2; United States v. Ramirez*, 94 F.3d 1095, 1099 (7th Cir.1996) (discussing purposes of § 5C1.2); *United States v. Thompson*, 76 F.3d 166, 171 (7th Cir.1996) (discussing legislative history of § 5C1.2). This Guideline has been nicknamed the "safety valve" provision. Less-culpable defendants must meet five criteria in order to qualify for application of this Guideline; the criterion relevant to Ramunno's appellate challenge requires that:

not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

USSG § 5C1.2(5). This exception benefits only those defendants who have "made a good faith attempt to cooperate with the authorities." *United States v. Arrington*, 73 F.3d 144, 148 (7th Cir.1996); *see also United States v. Montanez*, 82 F.3d 520, 522 (1st Cir.1996) (stating that eligibility for "safety valve" reduction of sentence hinges on full and truthful disclosures). As before, we review the district court's determination of Ramunno's eligibility for the "safety valve" exception for clear error. *See Thompson*, 76 F.3d at 171.

We agree with the district court that Ramunno forfeited his opportunity to benefit from the Guidelines' safety valve. Government investigators caught Ramunno in lie after lie. He wrote Rich Musilli for the purpose of hiding drug profits for safekeeping so that he could reap the benefit of a plea bargain without incurring the full cost. In his proffer interview on September 9, he confessed (part of) his earlier attempts to conceal from the Government the drug proceeds hidden in the Pennsylvania house. Then, in the final proffer interview on September 19, he denied writing a letter to anyone regarding the concealment of drug proceeds, and he denied that he had any assets in a safe deposit box until he was confronted directly with the Musilli letter. This, in short, is not a record of good-faith cooperation, and the district court was justified in denying Ramunno's request for application of § 5C1.2.

### C. *Plea Agreement*

■ Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, Ramunno

pleaded guilty to the two charged offenses on August 8, 1996. In exchange for this plea, the Government agreed to recommend a sentence on the low end of the Guideline-prescribed range, as well as to urge the district court to reduce the appellant's sentence based on his acceptance of responsibility. In addition, the Government stated that it might recommend further sentence reductions under USSG § 5K1.1 and Fed.R. Crim. P. 35 if Ramunno offered substantial assistance in prosecuting other criminals. These promises, however, were expressly conditioned on Ramunno's complete and total cooperation in his proffer interviews with the Government. The following passages from the agreement illustrate this point:

1. Defendant will cooperate fully with the United States....

2. Defendant also agrees and acknowledges that his obligation to cooperate requires him, upon request, to provide complete and truthful information to any Federal or State law enforcement agencies concerning any criminal activity about which he knows. Defendant agrees that any such information he provides enforcement agencies will be complete and truthful.

....

8. In conjunction with the provisions of paragraphs 1, 2, 3, and 4, hereinabove, Defendant specifically agrees and acknowledges that if he does not cooperate fully or does not testify truthfully before the Grand Jury or at any trial ... then the United States is completely released from any obligation arising from this agreement and the Defendant is subject to full prosecution and punishment for any crime known to the Government at this time....

....

17. The Defendant understands and agrees that if he ... violates any term or condition of this agreement, the Government is not bound by the provisions herein and may request that the Court impose on the Defendant any penalty allowable by law....

Full and complete cooperation is not merely an obscure condition; it is the overarching theme of the plea agreement.

Ramunno's final two proffer interviews in September demonstrated clear breaches of the plea agreement, but the Government refrained from scuttling the plea bargain at the request of Ramunno's counsel. Counsel made another request for additional negotiating time as late as October 15. During this period of uncertainty, the Probation Department filed with the district court a presentence investigation report that was consistent with the terms of the plea agreement. The Government did not object to the report's recommendations, despite the appellant's breaches, before expiration of the designated deadline of October 1. On November 1, defense counsel and the Government finally agreed that there was no chance of resurrecting any plea agreement. The Government soon after notified the district court that it would take the position that Ramunno breached the plea agreement. The district court agreed with the Government that Ramunno had breached the agreement and sentenced him without regard to the terms of his deal.

Ramunno challenges the Government's refusal to recommend a sentence in accordance with the deal struck in the plea agreement. He claims first that the Government waived any objections it might have had to the terms of the agreement by approving the presentence investigation report in October. In addition, he quixotically attempts to show that he did not in fact breach the agreement and that, thus, the Government was the breaching party. These claims must fail.

■ Ramunno cites no authority for the novel proposition that the Government waived its objections to the sentencing recommendations of the presentence investigation report. His position, essentially, rests on the logic that the Government knew of any putative breach of the plea agreement before October 1 and that the presentence report recommended a sentence consistent with this broken plea agreement. Thus, he argues, the Government lost its chance to contest the report's recommendations at the sentencing hearing by failing to object to the report within the proper time period. He did not argue this point to the district court,

and we can therefore only review his "waived waiver" argument for plain error. *See United States v. Robinson*, 20 F.3d 270, 273 (7th Cir.1994). There is no plain error here because Ramunno fails to consider that it was his own request for additional time to salvage the plea agreement that kept the Government from objecting to the report. Ramunno cannot now claim prejudice from a waiver that he induced. More fundamentally, we are not convinced that approval of a presentence report's recommendations binds the Government if circumstances change between the time of the approval and a defendant's sentencing hearing; such a rule would allow defendants to breach their plea agreements with impunity.

 We are at a loss to see how Ramunno can claim that he complied with the terms of his plea agreement. Ramunno's task is made even more difficult because he waived the issue by failing to state this objection at his sentencing hearing. *See United States v. Hicks*, 129 F.3d 376, 378 (7th Cir.1997). Even if he did provide truthful statements to the Government at times, his honesty was spurred only by the exposure of his prior misrepresentations. This is a far cry from the "complete and truthful" assistance on which the Government conditioned its adherence to the plea agreement. Indeed, at the sentencing hearing, Ramunno conceded that he did not cooperate fully with the Government; he argued only that this breach did not constitute an obstruction of justice. Ramunno's counsel stated:

> Your Honor, the government's contention is that Mr. Ramunno is in breach of the plea agreement, and without losing credibility before this Court, I would be willing and am going to indicate to the Court that Mr. Ramunno, without question, was in fact less than 100 percent candid.... [W]e're not complaining that Mr. Ramunno wouldn't necessarily even be in violation of his breach—of his plea agreement.

Even without this admission in the record, and even without the waiver of the issue, there is no question that Ramunno did not live up to his promise to give "complete" and "truthful" proffers of information to the Government.

 Plea agreements are contracts, and we interpret them according to ordinary contract principles. *See United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir.1992). Under these doctrines, a defendant's substantial breach of an unambiguous term of a plea agreement frees the Government to rescind the deal. *See United States v. Hauptman*, 111 F.3d 48, 51 (7th Cir.1997); *United States v. Ataya*, 864 F.2d 1324, 1330 (7th Cir.1988). Ramunno cannot expect the Government to adhere to a deal that he himself violated. At the most basic level, Ramunno lost his gamble that he could withhold complete cooperation and still receive a reduced sentence. Consequently, he loses the possible benefits of the broken plea agreement.

## III. CONCLUSION

For the foregoing reasons, we affirm the sentence imposed by the district court.